PEGGY MORRIS,

          Plaintiff,

    - versus -

NEW YORK CITY et al.,

          Defendants.

MEMORANDUM & ORDER
14-CV-1749 (JG) (LB)

JOHN GLEESON, United States District Judge:

  On March 14, 2014, *pro se* plaintiff Peggy Morris filed the instant complaint pursuant to 42 U.S.C. §§ 1982, 1983, 1985, and 1988, as well as additional sections of the United States Code and New York State law. Morris's application to proceed *in forma pauperis* is granted pursuant to 28 U.S.C. § 1915. The § 1983 claims against the City of New York (the "City") and the named New York City Police Officers may proceed; the claims against all other defendants are dismissed for the reasons set forth below.

## BACKGROUND

A. *Factual Background*

  The following allegations are taken from the complaint and are assumed to be true for the purposes of this motion. Morris "is a life-long community advocate who as of 2005 became a housing specialist focusing on foreclosure and eviction prevention." Compl. ¶ 33, ECF No. 1. Morris alleges that she "has been subjected to [a] campaign of police misconduct beginning in or about 2007 which include[d] five false arrests, including unlawful searches." *Id.* ¶ 34. One of these incidents, involving Morris's claim to occupancy of a Mitchell Lama cooperative unit at Rochdale Village, Inc. and subsequent arrest, was litigated in this court in

*Morris v. City of New York, et al.*, No. 12-CV-3959, 2013 WL 5781672 (E.D.N.Y. March 21, 2014) (dismissed with prejudice, appeal pending). Morris was involved in multiple additional landlord-tenant and foreclosure matters in her own right and on others' behalf between 2006 and 2011. *Id.* ¶ 37. Some of these incidents brought her into contact with officers at the 113th Precinct of the New York Police Department ("NYPD"). *Id.*

Morris alleges that her recent difficulties began when she became homeless after an "unlawful eviction on July 25, 2011." *Id.* ¶ 37(i). Morris "contacted Dawnett Simpson Clark . . . and asked her permission to layover in the attic apartment in the house she lost to foreclosure but continued to occupy, so that [Morris] would have a place to stay when [she] was required to be in New York for the purpose of attending court appearances . . . ." *Id.* Morris moved in with Clark and "help[ed] protect her and her family from ongoing threats of post-foreclosure eviction." *Id.* ¶ 39. Morris also assisted the family with child-care and meal preparation. *Id.* ¶ 40. The relationship between Morris and Clark deteriorated in May 2013 and Clark's children "were prohibited from interacting with or speaking to [Morris]." *Id.* Morris believed that "the methods employed by the family" to keep their youngest child away from Morris were too extreme and could cause the child physical harm, so on June 5, 2013, Morris filed an abuse complaint with the New York City Administration for Children Services ("ACS"). *Id.* ¶ 41.

After Morris filed the complaint, defendants Dawnett Clark and her husband Jason Clark allegedly began a campaign to "illegally evict" Morris by means of "physical assaults, threats of physical assault, intimidation, and petit larceny." *Id.* ¶ 43. The Clarks and additional occupants of the residence – defendants Tybsy Palmer, Carlton Brown, and Frank Jordon – "began an illegal lockout campaign" against Morris that included denying her access to the first and second floor kitchens. *Id.* ¶ 122. Defendants Linda Pierre and "John Doe aka

2

Ragon" aided and abetted the Clarks in intimidating Morris and made threats against her and her mother. *Id.* ¶¶ 29, 52.

On June 3, 2013, Dawnett Clark "chest bumped" Morris while Morris was holding hot food, which caused burns on Morris's wrists. *Id.* ¶ 48(a). On June 5, 2013, Morris's "studio apartment" door was kicked in, *id.* ¶ 48(b), and on August 2, 2013, her apartment was burglarized and vandalized. *Id.* ¶ 48(c). Morris filed a complaint regarding each of these incidents with the 113th Precinct. *Id.* ¶ 48. On August 4, 2013, Morris went in person to the 113th Precinct and overheard defendant Police Officer Kyle Bradley and Sergeant John McCormick describe them as "Bull S--t complaints." *Id.* ¶¶ 50-51. Morris learned around this time that Dawnett Clark had reported to the police that Morris had stolen checks and her identity. *Id.* ¶ 49.

On August 6, 2013, Pierre physically blocked Morris's exit from her apartment, while the Clarks threatened her. *Id.* ¶ 53. Morris called 911, and stayed on the line with operators until Pierre stepped aside. *Id.* When Morris returned to the apartment later that day Pierre again blocked her way and Morris again called 911 and spoke with the operator until Pierre let her pass. *Id.* ¶ 54. Morris sought an Order of Protection on August 14 or 15, 2013, but was denied by the Queens County Criminal Court. *Id.* ¶¶ 56-57.

Morris contacted defendants Deputy Inspector Miltiadis Marmara and Chief Phillip Banks, III, regarding her complaints on multiple occasions between August 14, 2013 and August 20, 2013. *Id.* ¶¶ 56-59. On or about August 20, 2013, Banks advised Morris that he had delegated someone to contact her, but no contact occurred until after Morris was arrested on August 22, 2013. *Id.* ¶ 59.

On August 20, 2013, at around 9:30 p.m., Morris awoke to the sound of her door being forced open, though it was kept from fully opening by a chain lock. *Id.* ¶ 60. She opened the door and saw Jason Clark on the landing next to a television set. *Id.* Morris closed the door and went back to sleep. *Id.* About 15 minutes later, Morris heard a person who sounded like Pierre at the door threatening her and trying to break the door down. *Id.* ¶ 61. When the door frame began to give way, Morris called 911. *Id.* When police officers arrived at Morris's apartment, they "had been advised, among other things that [Morris] was mentally disturbed." *Id.* ¶ 62. Jamaica Hospital Emergency Medical Service responders arrived, questioned Morris, and left. *Id.* The responding officers then spoke to the Clarks, who accused Morris of throwing a television down the stairs at them. *Id.* ¶¶ 63-64.

On August 21, 2013, Morris received an order to vacate her apartment because there was only one means of egress. *Id.* ¶ 67. Morris was advised that until "the condition was remedied" she was not allowed to "sleep at the premises." *Id.* On the same day, the police were again called to Morris's apartment. *Id.* ¶ 65. Officers Martinez threatened to arrest Morris and Morris left the apartment and started walking down the street. *Id.* ¶ 66. Martinez followed Morris and he and several other officers stopped her on the street, telling her that Sergeant Ostrowski wanted to speak with her. *Id.* Morris was afraid of Martinez and so she kept walking. *Id.* Ostrowski arrived, and took Morris back to her apartment. *Id.*

The next day, at about 6:00 p.m., Morris called 911 and requested a police escort to accompany her to the premises in order to retrieve some of her belongings. *Id.* ¶ 67. The police escorted her to her apartment, but then left the building. *Id.* After a couple of hours "the police were called to the residence again." *Id.* A discussion ensued between her and the officers about whether she was allowed to be at the premises. *Id.* ¶¶ 68-69. Defendant Police Officer

4

Marcantonio asked Morris: "What happened to you at Rochdale?" *Id*. ¶ 69. Defendant Police Officers Skobla, Vallanueva, and Marcantonio then arrested her at the apartment. *Id*. ¶¶ 69-70. While Morris was talking with Marcantonio, Skobla and Villanueva searched the apartment. *Id*. ¶ 71. After being transported to the station, Morris was handcuffed to a wall in a cold cell for six hours. *Id*. ¶ 80.

On August 24, 2013, Morris learned that Dawnett Clark had filed a Holdover Petition with the Queens County Housing Court on August 6, 2013. *Id*. ¶81. Morris claims that defendant Serena A. May "falsely alleged that she personally served [Morris] with a Thirty Day Notice . . . on June 30, 2013." *Id*. ¶ 82(a). According to Morris, the notice had actually been slipped under her door. *Id.*

B. *Claims Alleged*

Morris alleges that defendants May, McCrary's Justice Center, Dawnett Clark, the Law Offices of Salami-Oyakhilome, P.C., and Sadatu O Salami-Oyakhilome "conspired to and engaged in 'sewer service'" by failing to properly serve notice of the Holdover Petition and other documents relating to housing court proceedings. *Id*. ¶¶ 87-88. According to Morris, Dawnett Clark and Salami-Oyakhilome provided false testimony to the court "on all the appearance dates," *id*. ¶ 88, and conspired with defendant Tanyalee Murray to file false Affidavits and provide false statements to the court." *Id.* ¶ 124. Morris asserts that Salami-Oyakhilome also violated 15 U.S.C. § 1692 and various sections of the New York State Penal Code by filing false instruments. *Id.* ¶ 125-27.

Morris claims that defendants Jonathan Lippman, Fern Fisher, and John Landsen, all supervising judges of the New York State Unified Court System, failed to properly supervise the Civil Court Housing Parts. *Id*. ¶ 112. She claims that "[t]he rote supervisory response to the

5

pattern and practice of denying due process to respondents improperly or not called at all before the [Civil Court Housing Parts] is that 'we can't interfere in a court proceeding.'" *Id.* As a result, she claims that "the unlawful acts of the civilian Defendants" were "supported and validated by Lippman, Fisher and Landsen." *Id.* ¶ 115. She alleges that these defendants denied her rights under the First and Fourteenth Amendments and in violation of 42 U.S.C. § 1982, which protects against racial discrimination in holding real property. *Id.* ¶¶ 114-17.

Morris asserts that the individual police officers "engaged in a joint venture and formed an agreement to violate [Morris's] rights" and "assisted each other and the civilian protagonists in performing the various described conduct lending their physical presence and support and the authority of their office to each other during the said events in order to accomplish a false arrest in furtherance of unlawful ends." *Id.* ¶ 83. According to Morris, "the NYPD and Civilian Defendants found a symbiosis working together to effectuate [her] false arrest as a strategic move to aid and abet each other to attain retaliatory benefits and/or to thwart and/or punish [her] for sets of complaints [she] filed or was filing that these Defendants were being subjected to." *Id.* ¶ 119. Morris claims that the police officer defendants wanted to "thwart" her pending § 1983 lawsuit as well as the written complaints she had made with Deputy Inspector Marmara and Chief Banks. *Id.* ¶ 120. Morris believes that the "civilian" defendants took these actions against her in order to retaliate for the ACS complaint Morris filed against the Clarks. *Id.*

Morris claims that "[t]he conspiracy entered into by and between the Civilian and NYPD Defendants collectively, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the municipal authority of the City of New York, which is forbidden by the Constitution of the United States, and more specifically

6

violates 42 U.S.C. §§ 1982 and 1985." *Id.* ¶ 121.  Morris alleges municipal liability, claiming that the City and NYPD "knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendant[] police officers." *Id.* ¶ 99. Lastly, Morris alleges that her First Amendment rights were violated when unidentified "police personnel" and unspecified court officials "silenced" her when she advocated for property rights and "spoke out about due process and the court's lack of jurisdiction." *Id.* ¶¶ 129-30.

Morris seeks unspecified compensatory and punitive damages, with attorney's fees and costs.  *Id.* ¶ 131.

## DISCUSSION

A. *Standard of Review*

*Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys; I am required to read Morris's *pro se* complaint liberally and interpret it as raising the strongest arguments it suggests. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *accord Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (noting that pleadings of *pro se* litigants are accorded "special solicitude").  However, a complaint filed *in forma pauperis* may be dismissed "at any time" upon determination that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).  Where a liberal reading of the pleading "gives any indication that a valid claim might be stated," I must grant leave to amend it at least once. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quotation marks omitted).

B.  *Claims Under § 1982 and § 1985*

Morris brings claims under the civil rights statutes codified at 42 U.S.C. §§ 1982, 1983, and 1985. Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The statute has been interpreted to prohibit only "'intentional discrimination' based on race." *Sanders v. Grenadier Realty, Inc.*, 367 Fed. App'x 173, 174-75 (2d Cir. 2010) (quoting *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987)). Morris has not suggested that any of the defendants' actions were motivated by racial animus or that race played any role in her conflict with the Clarks and their associates, the police officers, or the administrative judges named as defendants. Accordingly, Morris's § 1982 claims are dismissed.

Section 1985(3) provides a remedy to redress a conspiracy entered into by two or more persons "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To make out a violation of § 1985(3), a plaintiff

> must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983). As a part of the second element, a plaintiff must show that the conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus . . . ." *Id.* (internal quotation marks omitted); *see also Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 419 (2d Cir. 1999) ("The

8

mere assertion of racial motivation, however, is not sufficient to state a conspiracy claim [under § 1985]."). Morris has not alleged that the defendants conspired against her because of her race or based on any other invidious class-based animus. Accordingly, her claims pursuant to § 1985 are also dismissed.

C. *Section 1983 Claims*

Section 1983 provides "'a method for vindicating federal rights elsewhere conferred,' including under the Constitution." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In order to make out a claim under § 1983, a plaintiff must demonstrate that the challenged conduct was "committed by a person acting under color of state law," and that the conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id*. (internal quotation omitted). "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)). The under-color-of-state-law requirement can be satisfied by actions taken by private individuals only in certain limited circumstances, such as where the private actor exercises powers "traditionally exclusively reserved to the State," *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974), or performs conduct that is "fairly attributable to the state." *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50. "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992). The private actor must be shown to be "a willful participant in joint activity with

9

the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).

Morris's § 1983 claims against the private defendants are based on conclusory allegations that are insufficient to support her claims. *See Spear,* 954 F.2d at 68 (conclusory allegations that a private entity acted in concert with a state actor do not suffice to state a § 1983 claim against the private entity). Morris alleges that "the NYPD and Civilian Defendants found a symbiosis working together to effectuate [her] false arrest as a strategic move to aid and abet each other." Compl. ¶ 119, ECF No. 1. Morris asserts that the NYPD defendants arrested her in retaliation for her previously filed complaints against them. She alleges that the Clarks sought her eviction in retaliation for her filing a complaint against them with ACS, and enlisted the assistance of their friends, other residents of the building, and a law firm in furtherance of this goal. These allegations do not support an inference that any of the civilian defendants conspired with the NYPD or judicial defendants for the purpose of violating her constitutional rights. Accordingly, the private defendants are not amenable to suit under §1983, and Morris's claims are dismissed as to defendants Dawnett Simpson Clark, Jason Clark, Tybsy Palmer, Carlton Brown, Frank Jordon, Tanyalee Murray, Linda Pierre, "John Doe aka Ragon," Serena A. May, McCrary's Justice Center, Sadatu O Salami-Oyakhilome, and the Law Offices of Salami-Oyakhilome, P.C. Because Morris's federal claims against these defendants are dismissed, I decline to exercise supplemental jurisdiction over the state law claims Morris asserts against these defendants.

Morris's claims against the judicial defendants are also dismissed. It is well established that judges enjoy absolute immunity from liability "for acts committed within their judicial jurisdiction . . . ." *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (citing *Bradley v. Fisher*, 13

Wall. 335 (1872)).  "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages."  *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Morris alleges that three supervising judges of the Housing Part of the New York State Unified Court System failed to properly supervise the Housing Part and thus "supported and validated" the alleged civil rights violations committed by the civilian defendants.  Compl. ¶ 115, ECF No. 1.  These vague and conclusory allegations relate to activities within a judge's judicial jurisdiction.  Accordingly, I conclude that the judicial defendants enjoy absolute immunity from liability stemming from these allegations and Morris's claims against Jonathan Lippman, Fern Fisher, and John Landsen are dismissed.

## CONCLUSION

For the reasons stated above, Morris's claims against Dawnett Simpson Clark, Jason Clark, Tybsy Palmer, Carlton Brown, Frank Jordon, Tanyalee Murray, Linda Pierre, "John Doe aka Ragon," Serena A. May, McCrary's Justice Center, Sadatu O Salami-Oyakhilome, the Law Offices of Salami-Oyakhilome, P.C., Jonathan Lippman, Fern Fisher, and John Landsen are dismissed.

Morris's § 1983 claims may proceed against the City of New York and defendants Marcantonio, Skobla, Villanueva, McCormick, Martinez, Bradley, Marmara, and Banks.  The Clerk of Court is directed to issue summonses against these defendants, and the United States Marshals Service is directed to serve copies of the complaint, this order, and the summonses without prepayment of fees.  A courtesy copy of the same papers shall be mailed to the Corporation Counsel of the City of New York.  The case is referred to the Honorable Lois Bloom, United States Magistrate Judge, for pretrial supervision.  The Court certifies pursuant to

28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
May 1, 2014